# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

## MIAMI DIVISION

### CASE NO.

JERRY JACOBS, individually and, on behalf
of all others similarly situated,

Plaintiff,

vs.

**CLASS ACTION COMPLAINT**

OSMOSE, INC., HICKSON CORPORATION, USA,
HICKSON CORP., HICKSON INTERNATIONAL ,
PLC, ARCH CHEMICALS, INC., HOME DEPOT,
U.S.A., INC., LOWE'S HOME CENTERS, INC.,
ROY O. MARTIN LUMBER CO, L.P., ROBBINS
MANUFACTURING CO., HOOVER TREATED
WOOD PRODUCTS, INC., FOLLEN WOOD
PRESERVING CO., INC., WOOD TREATERS, INC.,
and XYZ CORPORATIONS 1 through 25,

**JURY TRIAL DEMANDED**

Defendants.

_____/

Plaintiff, JERRY JACOBS, individually and, on behalf of all others similarly situated, by
and through his undersigned counsel, for his Class Action Complaint, alleges the claims set forth
herein.   Plaintiff's claims as to himself and his own actions, are based upon his personal
knowledge.   All other allegations are based upon information and belief pursuant to the
investigations of counsel.   Based upon such investigation, Plaintiff believes that substantial
evidentiary support exists for the allegations herein or that such allegations are likely to have
evidentiary support after a reasonable opportunity for further investigation and/or discovery.

## NATURE OF THE ACTION

1.      Plaintiff brings this class action lawsuit on behalf of a class more specifically defined herein at ¶80, of persons or public entities, and each such person's immediate family who have existing, or which existed during the Class Period, on their properties and/or have thereby been exposed to and/or come into substantial contact with CCA treated wood and/or lumber designed, manufactured, marketed, distributed, sold and/or advertised by defendants OSMOSE, INC. (hereinafter referred to as "Osmose"), HICKSON CORPORATION, USA, HICKSON CORP., HICKSON INTERNATIONAL, PLC., and ARCH CHEMICALS, INC. (all hereinafter referred to as "Hickson"), HOME DEPOT, USA, INC., LOWE'S HOME CENTERS, INC., the various treating defendants as defined hereinafter, and XYZ CORPORATIONS 1 through 25 (hereinafter referred to as "XYZ Corporation").

2.      Defendants Osmose and Hickson design, manufacture, market, distribute and/or advertise the preservative known as chromated copper arsenate ("CCA"), a mixture of copper oxide, chromic acid, arsenic and water for use in wood products and lumber, which, when infused into the wood and/or lumber, creates a treated wood commonly known under various names including (i) "Wolmanized® pressure-treated wood", (ii) Wolmanized® pressure-treated lumber", (iii) Osmose K-33® treated wood" (iv) "green lumber", (v) "green wood", (vi) "salt-treated wood", (vii) "salt-treated lumber", (viii) "pressure treated wood" and/or (ix) "pressure treated lumber" (hereinafter referred to collectively as "Treated Wood").

3.      As discussed below, Defendants have engaged in extensive advertising, marketing, publicity, distribution and sales campaigns promoting the supposed quality and safety of Treated Wood, directing those advertising, marketing, publicity, distribution and sales campaigns at prospective purchasers and end-users of Treated Wood who oftentimes include homeowners, farmers, carpenters and municipal owners of public playgrounds and playsets.

ARONOVITZ & ASSOCIATES, P.A., ATTORNEYS AT LAW, MUSEUM TOWER, SUITE 2700, 150 W. FLAGLER ST., MIAMI, FLORIDA 33130

4.     Defendants knew, or had reason to know, that the Treated Wood they manufactured, designed, advertised, publicized, marketed, distributed and sold was defective and unsafe, yet they, and each of them individually, concealed from the general public, purchasers of Treated Wood and end-users of Treated Wood, the potential dangers and deleterious and harmful effects of Treated Wood.

5.     Plaintiff and Class members purchased, used and/or were exposed to the Treated Wood which was knowingly designed, manufactured, advertised, publicized, marketed, distributed and sold, with defects and known potential dangers by Defendants.

6.     As a result of Defendants' knowingly designing, manufacturing, advertising, publicizing, marketing, distributing and/or selling the dangerous and defective Treated Wood, Plaintiff and Class members suffered injury or have been exposed to greater than normal levels of these hazardous substances due to defendants' acts.

7.     Plaintiff seeks, on behalf of himself and members of the Class, injunctive relief, equitable relief, the costs and expenses associated with remediation, removal, and medical monitoring, monetary damages, statutory, actual, and punitive damages, to redress Defendants' unlawful practices and acts associated with the designing, manufacturing, advertising, publicizing, marketing, distributing and selling of Treated Wood.

## JURISDICTION AND VENUE

8.     This Court has federal question subject matter jurisdiction pursuant to 15 U.S.C. §2301, et seq. (Magnuson-Moss Consumer Products Warranties Act). Plaintiff believes, in good faith, more than 100 consumers in the class can be identified for assertion of the Magnuson-Moss Consumer Products Warranty Act claim herein.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants either maintain their principal place of business within this district or provide services to Plaintiff

3

and Class members located in this district, and conduct substantial business in this district.
Moreover, Plaintiff resides in the district and has been subjected to the alleged wrongs
complained of herein in the district.

10.     In connection with the acts, transactions and conduct alleged herein, Defendants
used the means and instrumentalities of interstate commerce, including the United States mail
and interstate telephone communication.

## PARTIES

11.     Plaintiff is and was at all times relevant hereto, a resident of Miami-Dade County,
State of Florida and a homeowner who had during the Class Period installed, constructed and/or
existing upon his property a deck made of treated wood purchased at one of the retail defendants.

12.     Defendant OSMOSE is a foreign corporation, with its principal place of business
located in Buffalo, New York.

13.     Defendants HICKSON CORP., USA, and HICKSON CORP., are Delaware
corporations, with a principal place of business located in Atlanta, Georgia and each is and was,
at all relevant times, a wholly owned subsidiary of HICKSON INTERNATIONAL, PLC.

14.     Defendant HICKSON INTERNATIONAL, PLC, ("HIPLC") is, upon information
and belief, and was, at all relevant times, a corporation organized under the laws of the United
Kingdom, and the parent company of Defendant HICKSON CORP., USA, owning all of its
stock.

15.     Defendant ARCH CHEMICALS, INC. ("Arch"), upon information and belief, is
and was a foreign corporation with its principal place of business in Norwalk, Connecticut. Arch
is and was at all times relevant, a publicly traded company on the New York Stock Exchange
under the symbol "ARJ." Since in or about August or September 2000, Arch was the owner of
all of the stock in HIPLC.

4

16.     HOME DEPOT, U.S.A., INC. ("Home Depot") is, *inter alia*, a national full service retailer of lumber, hardware and construction products, which includes Treated Wood, with stores nationwide, including the State of Florida and in this district.  Home Depot is a Georgia corporation.

17.     LOWE'S HOME CENTERS, INC., ("Lowe's") is, *inter alia*, a national full service retailer of lumber, hardware and construction products, which includes Treated Wood, with stores nationwide, including the State of Florida and in this district.  Lowe's is a North Carolina corporation.

18.     Lowe's and Home Depot are referred to hereinafter, at times, as "Retail Defendants."

19.     ROY O. MARTIN LUMBER CO., L.P. ("ROM") is a wood treater and seller located in Alexandria, Louisiana and, through its Colfax Treating Company division, is a large regional manufacturer and supplier of Treated Wood.

20.     ROBBINS MANUFACTURING COMPANY ("Robbins"), which represents itself to be one of the largest sources of Treated Wood in Florida, is a wood treater and wholesaler with its principal place of business located in Tampa, Florida and with plants operating within the State of Florida.

21.     HOOVER TREATED WOOD PRODUCTS, INC ("Hoover"), is a foreign corporation with its principal place of business in Thomson, Georgia.   Hoover is, upon information and belief, is a subsidiary of Ply Gem Industries, which is in turn a subsidiary of Nortek, Inc.  Hoover is a treater, manufacturer and supplier of Treated Wood.

22.     FOLLEN WOOD PRESERVING CO., INC. ("Follen") is a treater, manufacturer and supplier of Treated Wood nationwide and maintains its principal place of business in Jackson, Mississippi.

ARONOVITZ & ASSOCIATES, P.A., ATTORNEYS AT LAW, MUSEUM TOWER, SUITE 2700, 150 W. FLAGLER ST., MIAMI, FLORIDA 33130

23.     WOOD TREATERS, INC., ("WTI") is a treater, manufacturer and supplier of Treated Wood and represents itself to be one of the largest sources of Treated Wood in the State of Florida.  WTI maintains its principal place of business in Jacksonville Florida.

24.     Defendants ROM, Robbins, Hoover, Follen and WTI are referred to hereinafter, at times, as the "Treating Defendants."

25.     Defendants XYZ CORPORATIONS are fictitious names, intended to represent additional entities not yet named herein who may be added as additional Retail Defendants and/or Treating Defendants and which either treat wood with the CCA products and/or who act as retail distributors of the Treated Wood products complained of herein and whose names are not presently known to Plaintiff.

26.     At all times material hereto, each defendant named in ¶¶'s 12 through 25 above designed, manufactured, advertised, publicized, marketed, distributed and/or sold the Treated Wood which is the subject of this class action complaint.

## FACTUAL ALLEGATIONS

27.     Defendants Osmose and Hickson are manufacturers, designers, marketers, distributors and/or  sellers of Treated Wood products sold under the trade name(s) "Outdoor Wood" or "Wolmanized"® wood (included hereinafter within the definition of "Treated Wood").

28.     All defendants named in the within class action complaint have designed, advertised, publicized, manufactured marketed, distributed and/or sold the aforementioned Treated Wood products in negligent, reckless and/or intentional disregard of the harmful effects of the chemical(s) used in the treatment process.

### The Chemical Treatment Process Generally Used To Create Treated Wood

29.     Treated Wood is created by pressure treatment which infuses into the wood a

6

liquid solution containing chromated copper arsenate ("CCA"). Typical applications of the wood include outdoor decks, playground equipment, joists, beams and posts in home construction.

30. Treated Wood is produced in special treating plants by the Treating Defendants and other treating entities, where a liquid preservative, CCA, is injected by vacuum and pressure under controlled conditions.

31. The lumber is placed on trams and pushed inside a steel pressure cylinder.

32. The cylinder is sealed and a vacuum pump is used to exhaust the air from the cylinder as well as the cells of the wood. This vacuum process does not dry the lumber. The lumber must be dried to a low moisture content before it is placed in the cylinder, otherwise, there is only a limited or inhibited ability to absorb the wood preservative chemicals.

33. Following the vacuum cycle, the preservative solution is drawn in to the cylinder from a wood tank until the whole cylinder is filled with preservative.

34. Once the cylinder is full, a pressure pump forces more solution into the wood. This builds up the pressure, driving the preservative into the wood. The excess solution in the cylinder is pumped back into the storage tank.

35. The Treated Wood, when removed from the cylinder, has a yellowish color (similar to the solution). Over the next several hours this color changes on some wood, to a greenish color (unless the wood has been previously stained), which is the result of the chemical residue forming on the surface of the wood, hence the term "green lumber" as used for Treated Wood.

36. CCA, the chemical solution used in the aforementioned treatment process, contains the chemical elements chromium, copper and arsenic, chemicals that enter the human body in any of four ways, (i) skin absorption, (ii) breathing, (iii) ingestion into the body; (iv) or

7

penetration of the skin.

### Arsenic

37.     The form of arsenic used in the wood-treating solution is water-soluble pentavelant arsenic. The arsenic compounds are arsenic pentoxide, arsenic acid, sodium arsenate or disodium hydrogen arsenate. During the fixation process, a portion of the pentavalent arsenic also transforms into trivalent arsenic. Both are toxic, though trivalent arsenic is generally recognized as more toxic to humans. The percentage of arsenic which may be susceptible to leaching or transference as residue depends upon a number of factors including but not limited to the amount of time for drying the wood after removal from the cylinders, the method of drying the wood, the method and manner of storing (e.g., dead-packed) and the formulations used of the solution.

38.     The manner and method of pressurizing, drying and storing may also result in a "sludge" being formed on the wood of arsenic, chromium and copper residues.

### Chromium

39.     The chromium used in the wood treatment process is water-soluble hexavalent chromium ("Hexavalent Chromium") in the form of chromic acid, sodium dichromate, potassium dichromate, or sodium chromate. Hexavalent Chromium is the form of chromium most toxic to humans. During the fixation process, most Hexavalent Chromium becomes trivalent chromium. However, a percentage of Hexavalent Chromium remains. This percentage is dependent upon a variety of factors.

40.     For example, CCA Treated Wood that has been kiln dried may still contain Hexavalent Chromium. CCA Treated Wood that has been air dried may contain substantially more Hexavalent Chromium. Additionally, if the CCA Treated Wood is dried without spacing between the wood (e.g., dead-packed) or is packed together before adequately dried, an amount

8

of Hexavalent Chromium may remain and a residue on arsenic and chromium form on the wood surface.

## Copper

41.     The copper used in the wood treatment process is in the form of copper oxide, copper carbonate, copper sulphate, or copper hydroxide.

42.     The manner in which the chemical elements of CCA (i.e., chromium, copper and arsenic) bond to the wood varies in proportions, forms and degrees, depending on variables such as (i) proportions of chromium, copper and arsenic in the treatment solution, (ii) the pH of the CA formulation used, (iii) the temperature of the solution during the treatment process, (iv) whether, and in what manner the wood is dried, stacked, packed and shipped; and (v) the type of wood treated.

## History of Applications of Pressure Treated Wood

43.     Historically, untreated cedar and fir were used for decks, playsets and playground equipment but as prices of those woods increased, marketers of plantation-grown southern pine seized on pressure Treated Wood as a way to convert their product into one that would command a premium price.

44.     Sales of Treated Wood ballooned from small amounts in the early 1970's to 467 million cubic feet in 1997, representing nearly a fifth of all softwood boards and timbers sold.

45.     By the 1970s, CCA pressure treated wood (i.e., Treated Wood) gained acceptance for a broad range of residential, commercial, industrial, agricultural and marine applications.  At about the same time, Treated Wood began to be used for building projects including but not limited to dog houses and planter boxes to sundecks, walkways, patios, as well as municipal uses including decking, playgrounds and walkways.

46.     Due in large part to the publicity, advertising and marketing of CCA-treated wood

9

designers, producers, manufacturers, marketers, and sellers, from 1980 to 1990, lumber and plywood treated with CCA wood preservative ( i.e., "Treated Wood") in the United States tripled.

47.     Treated Wood is widely used throughout the United States.  It is promoted as being suitable for, among other things, fences, steps, decks, retaining walls, children's playdecks, playground equipment, playsets, walkways, sandboxes, patio tables, chairs, compost bins and storage sheds (hereinafter referred to as "Treated Wood Consumer Products").

48.     Treated wood is marketed and sold to both the construction industry and individual consumer purchasers by the Defendants.

49.     In 1978, the U.S. Environmental Protection Agency ("EPA") commenced a Rebuttable Presumption Against Registration ("RPAR") proceeding against CCA Treated Wood preservatives as used in Treated Wood.  The Defendants, together with other wood preservers and their trade organizations, lobbied intensely against the RPAR proceeding and in favor of its termination.

50.     In order to induce the EPA to terminate its RPAR proceeding, Defendants and the other wood preservers and their trade organizations voluntarily offered to develop a Consumer Awareness Program ("CAP") in which a Consumer Information Sheet ("CIS"), which set forth the dangers and warnings necessary to inform end users of the wood, would be distributed to all end users of Treated Wood.

51.     The Consumer Awareness Program proposal stated in pertinent part:

> The CIS will serve as the main vehicle for conveying information about pressure treated woods to infrequent consumers of landscape ties, fence posts, and lumber and timber.   Typically, these consumers are purchasers of small quantities of pressure treated wood.  They are usually home owners, farmers and some types of construction workers who are  generally untrained in the proper

10

selection and use of pressure treated wood. <u>Therefore, the focus of the CAP will be on ensuring the dissemination of the CIS at the time of sale or delivery to these end users</u>. (Underscoring added).

52.     Based on the representations contained in the offer to conduct the CAP, that the CIS would be disseminated "at the time of sale or delivery to...end users", the EPA terminated its RPAR proceeding against the Defendants.

53.     The termination of the RPAR proceedings and the basis of the termination thereof were embodied into a notice published in the Federal Register in January, 1986 which stated that the mandatory Consumer Awareness Program requiring mandatory labeling of Treated Wood was eliminated because the various wood preserving entities would undertake a voluntary CAP including dissemination to the end user of the CIS. The Notice stated:

> Under the voluntary Program, a Consumer Information Sheet (CIS), which contains language agreed upon by the Agency and the wood treatment industry, will serve as the main vehicle for conveying information about treated wood to users. <u>This CIS will be disseminated at the time of sale or delivery to end users of treated wood</u>. (Underscoring added).

54.     In fact, as set forth in detail herein below, the CAP proposal was never enforced, and is, in fact, a farce. In fact, Osmose, Hickson, the Treating Defendants and their trade organization have, as detailed below, engaged in the dissemination of misinformation, and the omission of material information to conceal the true dangers, harmful effects and toxic properties of Treated Wood. Furthermore, the CIS, which Defendants cited as required to be disseminated to the end users, are virtually never given or even shown to end users who purchase Treated Wood and/or use it on their properties.

### The Claims of Defendants' Concerning Pressure Treated <u>Wood Contain Misrepresentations, Omissions and Half-Truths</u>

55.     As set forth hereinabove, Defendants have conducted and engaged in a full scale marketing and public relations campaign involving and consisting of a course of

ARONOVITZ & ASSOCIATES, P.A., ATTORNEYS AT LAW, MUSEUM TOWER, SUITE 2700, 150 W. FLAGLER ST., MIAMI, FLORIDA 33130

misrepresentation, omission and half-truths to assuage the public and conceal the true dangers, harmful effects and toxicity of Treated Wood.

56.     Written materials which are widely and publicly disseminated and targeted for the specific consumption of consumers, by the Hickson, Osmose, the Treating Defendants, manufacturers and distributors of Treated Wood, contain the following assertions and misstatements of fact:

- CCA pressure treated lumber can be handled, sawed, planed, drilled, and nailed in ways similar to untreated wood;

- Treated Wood is in compliance with all applicable government and industry regulations;

- Treated Wood is harmless to people, plants, pets the environment;

- Treated Wood is suitable for practically all uses without restriction;

- The proper use of Treated Wood is almost identical to that of untreated wood;

- Pressure treated wood products can be handled following normal safety practices;

- Treated Wood represents a harmless conversion of some chemicals that might otherwise pose environmental problems.  For example, when used in the production of Treated Wood, the potentially dangerous arsenic by-product is put into relatively harmless form;

- Treated wood is safe in all applications;

- Once the CCA solution is fixed in the wood cells, it is highly leach resistant, and because the wood is a renewable resource, it makes good environmental sense; and

- CCA Preservatives are bound in wood, are not readily leached and will not concentrate in plants growing close to Treated Wood.

57.     HICKSON, a company that proclaims itself as a leader in defending Treated Wood against skeptics and promoting the long history of Treated Wood, has distributed written materials relating to Treated Wood which are widely and publicly disseminated and targeted for

12

the specific consumption of consumers, and which contain the following statements:

- One reason Treated Wood lasts so long is that the preservative becomes "fixed" in the wood -- it forms a chemical bond which is leach resistant;

- The fixed preservative will not harm people, plants, or pets when used as recommended;

- Just follow published recommendations, most of which are common sense and apply equally well to untreated wood;

- The fixed preservative in treated Wood is highly resistant to leaching; and

- Study after study has verified the harmlessness of treated wood in gardens.

58.     Furthermore, HICKSON's public relations spokesmen have disseminated in widely published magazines and newspapers misleading statements concerning Treated Wood:

- CCA in the wood is extremely leach resistant because it reacts chemically with the wood and is actually "fixed" in the fibers, and there is no evidence that it will leak out and harm vegetables or plants;

- CCA in pressure treated wood is locked or bonded into the wood fibers and will not leach out. "About the only thing that can interrupt the bond (of the wood and the CCA chemical preservatives) is fire";

- The Environmental Protection Agency ("EPA") has reviewed the use of Treated Wood and found it to be fully acceptable for playground equipment and decks;

- Research has shown that exposure to treated lumber poses no greater risk of skin cancer than exposure to sun light;

- Retail customers should receive a Consumer Information Sheet (CIS) from seller when they buy treated wood (though, as set forth above-- none if ever distributed to the end-user). In the CIS customers can read complete and detailed guidelines about the use of Treated Wood; and

- There is no reason to avoid using treated wood in a playground or to avoid walking barefoot on treated wood decks.

59.     HICKSON also makes the following claims concerning Treated Wood:

- The chemicals in CCA do not migrate;

13

- When used as recommended, Treated Wood is harmless to people, plants and is beneficial to the environment;

- The EPA determined that CCA compounds lack the ability to penetrate the skin;

- Normal food preparation on picnic tables made of treated Wood is "fine";

- While some forms of arsenic and chromium are regarded as capable of inducing cancer in humans, the forms of arsenic and chromium that have been shown to be carcinogenic are not present in Treated Wood; and

- Wolmanized® Wood (i.e., Treated Wood): It's Good for Life.

60.     Defendant Osmose has stated in its literature that "CCA Treated Wood is much less acutely toxic than ordinary table salt."

61.     Notwithstanding its public dissemination designed to reach consumers and portray Pressure Treated Wood in the most favorable possible light and a wholesome "consumer friendly" product, in Hickson's Material Data Safety Sheet ("MSDS") dated 1/92, which the consumers and/or end users do not receive or see, HICKSON makes the following admissions concerning health hazards associated with Treated Wood:

- Eyes:  Treated or untreated wood dust may cause mechanical irritation;

- Skin:  Prolonged and/or repeated direct contact with treated or untreated wood may cause mild, transient irritation;

- Inhalation:  Finely divided treated or untreated wood dust may cause nose, throat, or lung irritation and other respitory effects;

- If one ounce of treated wood dust per 10 lbs body weight is ingested, acute arsenic intoxication is a possibility;

- If treated wood is burned, toxic chemicals may be produced as part of the smoke and ashes;

- Hazardous ingredients in CCA treated wood include, chromium III, arsenic and copper;

- Toxic dusts are created when CCA-treated wood is sawed or machined;

14

- Combustible products contained in CCA-treated wood include, metals, including arsenic;

- Studies of children using Wolmanized treated wood playground equipment have shown that arsenic is transferred from the wood surface to the child; and

- Leaf, stem and fruit of grape plants grown adjacent to Treated Wood poles took up arsenic.

62.  Yet, certain wood distributors using Defendants' CCA solutions, in their Material Safety Data Sheets ("MSDS"), make the following admissions:

- Prolonged or repeated contact with Treated Wood dust may result in irritation;

- A single ingestion of a large amount of Treated Wood dust may require immediate medical attention.

63.  In its Material Safety Data Sheet ("MSDS") dated 1/92, HICKSON makes the following admissions concerning health hazards associated with Treated Wood:

- Handling treated wood may result in irritation; and

- A single ingestion of treated wood dust may require immediate medical attention.

64.  In their MSDS's, both Hickson and certain of the wood treaters omit any mention of the presence of trivalent arsenic or Hexavalent Chromium as constituent chemical component ingredients of the Treated Wood products.

### The Harmful Effects Associated With Exposure To CCA Treated Wood Have Been Documented In The Literature And In Cases Involving Extreme Injury and Harm To Humans

65.  In fact, the effects of arsenic poisoning include severe gastritis, headaches, vertigo, and muscle spasm. Long range effects include severe crippling, gastrointestinal disturbances, inflammation of the nose and throat and skin afflictions, renal failure, substantial

15

cognitive problems, cancer of various types, and muscle atrophy in the legs.

66.     The effects of abnormal amounts of chromium in the human body include severe kidney damage, nausea, vomiting, shock, and long term effects include, contact dermatitis, skin ulceration, perforation of the nasal septum.

67.     The effects of toxic exposure to copper are fever, chills, muscle ache, and respiratory distress, nausea, vomiting coma, shock and death, and long-term effects include jaundice and central nervous system dysfunction.

68.     The harm from exposure to CCA Treated Wood is the result of exposure to the constituent chemicals used in treating the lumber and wood.

69.     There are numerous reported incidents of humans and livestock being severely injured or harmed by exposure to the chromium, copper and arsenic elements in Treated Wood, including:

- A family residing in Northern Wisconsin was plagued by symptoms including sensory hyperesthesia, muscle cramps, earaches and otitis media, sinusitis, bronchitis and pnemonitis, hair loss. It was determined that these symptoms were the result of exposure to high levels of arsenic caused by the combined effects of fumes and vapors of copper chromium and arsenic created when Treated Wood was burned in the family stove;

- In the mid 1980s an Indiana carpenter employed by the United States Department of Agriculture to make picnic table out of freshly treated "salt-treated" wood was exposed during the construction process to the substantial sawdust produced by intensive sawing and drilling the wood inside the workshop. At times, the non-ventilated room became so full of sawdust that the overhead door had to be opened to clear the air. After three weeks, the individual and a co-worker developed nasal congestion and bleeding from the nose. In addition, he developed symptoms including massive melena, hair loss, cramping, fatigue and itching. While those symptoms disappeared three months after working with the freshly treated "salt-treated" wood, there was an immediate re-occurrence one year later when he resumed the same task. Arsenic levels in that individual's hair and nails was determined to be hundreds of time greater than normal.

ARONOVITZ & ASSOCIATES, P.A., ATTORNEYS AT LAW, MUSEUM TOWER, SUITE 2700, 150 W. FLAGLER ST., MIAMI, FLORIDA 33130

- In an article by Michael Comfort, reproduced and provided by Hickson Corporation, November 1993, a survey of 46 workers using CCA treated timber for walking track constructions showed that "[a]bout one-quarter of the respondents were aware of workers who had suffered some health problems after handling treated timber. Complaints included: skin rashes, infections from cuts, splinters and dust; sore throats and dizziness."

- In interoffice correspondence dated July 25, 1977, Robert D. Arsenault, an employee of Koppers Company, named three instances concerning CCA dust toxicity to workers who were exposed constantly by either sawing, sanding, or planing the material:

  (1)   In approximately 1968, I had a local pattern shop cut strength test specimens from CCA treated poles. Small specimens were machines and planed. After approximately one week of working with this material, the man doing most of the work went home sick with respiratory illness, coughing, and general ill health. He returned to work after several days of recuperation.

  (2)   During the second week of January 1977, I received a report from Bob Stephens in Canada. Workmen who were building prefabricated, all weather wood foundations from ACA and CCA treated wood were coughing up blood and had developed a skin rash. I know of no further complications with this problem.

  (3)   This month at the Forest Products Research Society Meeting in Denver, Professor C.S. Walters told me that students who were sanding CCA treated wood in his laboratory became ill fro inhaling the CCA treated wood dust. I told him this had happened before in the case of the first instance mentioned above, and there were no complications to the best of my knowledge. Walters obtained the CCA concentrate from Koppers before he started his recent test work.

- Edward Polaski, the Technical Representative, Plant Manager and Senior Product Development Engineer with Koppers Company, from June 1970 to December 1980 suffered pain from a CCA splinter in his hand that woke him up on the middle of the nights and was full of puss. Mr. Polaski was advised by Bill Henry, the Director of Research, Koppers Company, that you need to get CCA splinters out right away or they're going to fester and cause problems.

17

- The incident data system of the U.S. Environmental Protection Agency shows the following reports of injury from CCA Treated Wood:

(1) "In an incident report received 8/1/91, a Florida man handling treated lumber, which was not properly marked with warnings, reported severe injury. He experienced itching, burning rashes, neurological symptoms, and breathing problems."

(2) "In a report dated 1/1/94, a construction supervisor reported 'ruined' nerves in feet and legs. Believes saw dust and fumes from cutting and routing much CCA-treated lumber are responsible."

(3) "In an incident report dated 01/01/95, pressure treated wood caused a chronic rash that persisted for 3 years. The rash was subsiding when, in 9/98, the person cut some pieces of CCA-treated wood and the rash returned."

(4) "On 5/16/95 a person received a splinter from CCA-treated wood which then developed into a severe infection requiring surgery. Dorsal cellulitis, ascending lympangitis, and acute tenosynovitis were reported."

(5) "Sawdust from CCA-treated wood blew into a clerk's eye. The eye became swollen and irritated. The report indicated that the clerk had previously been sawing the wood and had worn safety goggles."

(6) "Two workers were exposed while working with CCA-treated wood. Dust masks were worn. Symptoms reported included headache, nausea, shakiness, and thirst."

(7) "A worker not wearing protective gloves was handling CCA-treated wood and wiped his eye with his contaminated hand. Eye swelling and redness was reported."

(8) "A worker developed a rash on both forearms after handling CCA-treated lumber. No gloves or arm protection was worn."

(9) "Lumber yard worker developed contact dermatitis on both palms and fingers after handling CCA-treated wood."

(10) "A lumber mill worker reported nausea and headache radiating down to shoulders after boring holes in wood to

18

check penetration of CCA treatment."

(11)   "A wood treatment facility worker experienced eye irritation after CCA from freshly-treated lumber splashed into his eye."

(12)   "In 1998, seven cows out of a herd of 37 became ill with diarrhea, weakness, stumbling, and prostration. Four of the seven cows died within 48 hours of onset of symptoms. All cows in the herd were in otherwise good health and feed and water was negative for any causative agent. A burnsite in the pasture was found to contain ashes and incompletely burned CCA-treated fence posts with an arsenic concentration of 1850 ppm.  Upon autopsy the four deceased cows had multifocal abomasal hemorrhage, severe hyperemia of the small intestine, and arsenic concentrations in the liver, abomasal contents, and rumen contents of 4.2, 42, and 105 ppm, respectively (Hullinger, et al. 1998)."

- Commencing 1979 through 2000, at least 18 cases have been filed alleging personal injuries caused by inorganic arsenically treated wood.

70.   The fact that water-borne wood preservatives from CCA Treated Wood leach into the environment has been substantiated by laboratory tests and field experience.  One such study was recently conducted by The Connecticut Department of Analytical Chemistry in 1999.  That study involved analysis of chromium, copper and arsenic levels in soil under decks built from Treated Wood, and identified potential concern associated with Treated Wood as:

(a)   arsenic translocating to soils and water via (i) leaching from wood; (ii) runoff from lumber yards where Treated Wood was present; and (iii) sawdust from, and physical wearing of Treated Wood; and

(b)   human exposure to arsenic (i) dislodged from CCA wood surfaces;  (ii) during construction from inhalation of sawdust, and ingestion by hand to mouth; (iii) by plant uptake; (iv) in soil from inhalation of dust and ingestion by hand to mouth; and (v) by burning the wood due to toxic fumes generated by chemical components that do burn.

19

## The University of Florida Study

71.     In or about November 2000, the State University System of Florida's Center for Solid and Hazardous Waste Management conducted a study of various CCA pressure treated wood decks in various municipal locations in Florida.

72.     In the study, approximately 65 soil samples were collected from below pressure treated decks. Control samples from nearby locations were also taken. The study noted that "the average arsenic concentration in the "below deck" soils was 28 milligrams of arsenic per kilogram of soil ("mg/kg") whereas the control samples averaged 1.5 mg/kg. The average chromium content for "below deck" soils was 34 mg/kg, as compared to less than 10 mg/kg for the control samples.

73.     The study noted that "Results of standardized leaching tests show that new CCA-treated wood leaches enough arsenic to routinely fail the U.S. EPA's toxicity levels" and that "The overall results of the study indicate that CCA-treated wood does impact the environment during its service life by increasing the metal concentrations of soil." The study further noted hat "The amount of arsenic associated with CCA-treated wood currently in service in Florida is estimated at 26,800 tons. This quantity is enough to increase the arsenic concentration of a volume of water equal to 130 times the size of Lake Okeechobee by 50 ug/L, which is the current federal drinking water limit." Notably, the federal drinking water limit has since been reduced even further to 10 ug/L.

74.     The study noted that the samples tested for arsenic at the CCA Treated Wood sites substantially exceeded all recommended levels. For example, the U.S. EPA soil screening level for arsenic is 0.4 mg/kg. Florida's soil clean-up target levels for arsenic is 0.8 mg/kg for residential areas. Yet, the arsenic levels in the soil samples tested under the CCA decks ranged from 1.2 mg/kg to 217 mg/kg with an average of 28.5 mg/kg. The following Chart represents the

20

soil sample findings with respect to arsenic content[1]:

Table II.2:  Arsenic Results for Surface Soils



Figure II.1:  Comparison of Mean Deck Arsenic Soil Concentration versus
Control Soil Concentrations

75.    With respect to Chromium levels, the following chart compares the soil under

CCA-treated decks tested as compared with the control samples tested:



Figure II.3:  Comparison of Mean Deck Soil Chromium Concentration versus
Control Soil Concentrations

76.    Moreover, the United Stated Environmental Protection Agency has concluded that

inorganic arsenic (i) can exert toxic effects on humans after exposure, long-term or short-term

and (ii) is a multi-site human carcinogen by drinking water routes.

77.    Furthermore, recently conducted tests around the country of playset and playscape

---

[1] Abbreviations refer to locations of sites within each city identified.

ARONOVITZ & ASSOCIATES, P.A., ATTORNEYS AT LAW, MUSEUM TOWER, SUITE 2700, 150 W. FLAGLER ST., MIAMI, FLORIDA 33130

equipment used by children, constructed with CCA Treated Wood, have determined, by analyzing test wipes and taking wipe samples from the playsets and playscape equipment simulating transfer onto children's hand's, that higher than average levels of arsenic are contained on the wipes of such playground and playset equipment and can, therefore, be absorbed through the skin or ingested.

78.     Based upon the foregoing, the Defendants' claims that the chemicals are harmless, that they do not leach into the soil and that are fully fixated into the wood and pose no potential harm to users and/or children, are false and misleading statements designed to conceal the true facts from the end users of the product.  Moreover, the intentional failure to hide or substantially conceal the toxic effects or potential harm of CCA Treated Wood and failure to cause the effective distribution to end users of any CIS material warning the consumer of the toxic content and effect of Treated Wood has caused harm to Plaintiff and the Class.

79.     The presence of massive amounts of Treated Wood poses site disposal problems of monumental proportions for standard waste sites and substantial deleterious and toxic contamination resulting from CCA's components leaching into the supplies of potable water.

## CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this class action on behalf of himself and others similarly situated, as members of the proposed Plaintiff class.  The proposed class ("Class" hereinafter) which Plaintiff seeks to represent is comprised of all persons and municipal entities and such persons' immediate family, in the United States who during the period from 1981 to the present fall within the following three descriptions:

(a)     Owners or lessees of property (and their immediate family members) who have existing upon or installed or constructed upon their property during the Class Period: Treated Wood Consumer Products, including playground equipment,

playset equipment and/or decking constructed of CCA Pressure Treated Wood which has been designed, manufactured, marketed, distributed or sold by any of the Defendants and/or their affiliates, agents or representatives;

(b)     Municipalities and their subdivisions which have existing upon or installed or constructed upon their property during the Class Period Treated Wood Consumer Products, including playsets, playground equipment, playset equipment, decking and/or walkways containing CCA Pressure Treated Wood which has been designed, manufactured, marketed, distributed or sold by any of the Defendants and/or their affiliates, agents or representatives;

(c)     Persons, including children, who, during the Class Period regularly have come into contact with the Treated Wood Consumer Products, including playsets, playground equipment, playset equipment, decking and/or walkways containing CCA Pressure Treated Wood which has been designed, manufactured, marketed, distributed or sold by any of the Defendants and/or their affiliates, agents or representatives.

81.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number and identity of Class members cannot be ascertained by Plaintiff at this time, it includes persons who purchased, used or were exposed to Treated Wood.  Thus, the individual joinder of such persons in a single action is impracticable. The disposition of the Class members' claims in this class action will substantially benefit both the parties and the Court.  The numerosity requirement of Federal Rule of Civil Procedure 23(a)(1) is therefore satisfied.

82.     Rule 23(a)(2) and Rule 23(b)(3) are both satisfied because there are questions of law and fact common in Plaintiff and the Class which predominate over any individual questions

23

affecting only individual members.  Among these common questions of law and fact are:

(a)     Whether Defendants knew or had reason to know of the dangerous nature of Treated Wood;

(b)     Whether Defendants participated in and/or committed or are responsible for the conduct complained of;

(c)     Whether Defendants' conduct constitutes the violations of law alleged herein;

(d)     Whether Defendants have failed to adequately notify the Class of their dangerous products;

(e)     Whether Defendants' have failed to meet their obligations under the requirements for notification to end users of Treated Wood products, as required based upon representations made in connection with the CAP program and CIS sheets;

(f)     Whether Defendants' conduct was negligent or reckless in failing to properly notice, give warning to the Class or disseminate information to the Class about the harmful effects of pressure Treated Wood;

(g)     Whether Defendant breached any warranties as alleged herein;

(h)     Whether Defendants' conduct was willful and/or intentional;

(i)     Whether Defendant's actions were fraudulent as alleged herein;

(j)     Whether Class members are entitled to statutory damages and, if so, in what amount;

(k)     Whether Class members are entitled to compensatory and/or punitive damages and, if so, in what amount;

(l)     Whether Class members are entitled to medical monitoring for any of the harmful effects of CCA Pressure Treated Wood;

(m)     Whether Plaintiff and the Class members are entitled to recover the costs of remediation of or removal of the Treated Wood structures which exists on their properties and other equitable relief; and

(n)     Whether Plaintiff and the Class are entitled to the injunctive, remedial and declaratory relief sought in this action.

83.     In satisfaction of Federal Rule of Civil Procedure 23(a)(3), Plaintiff's claims are

typical of the Class' claims and do not conflict with the interests of any other members of the

Class because Plaintiff suffered damages as a direct and proximate result of using and/or being

24

exposed to Treated Wood designed, manufactured, advertised, publicized, marketed, distributed and/or sold by Defendants without knowledge of the danger effects of such Treated Wood. Plaintiff asserts claims that are typical of the claims of the entire Class, and all Class members have been subjected to the same wrongful conduct.

84.     In satisfaction of Federal Rule of Civil Procedure 23(a)(4), Plaintiff will fairly and adequately represent and protect the interests of other Class members and has no interests antagonistic to or which irreconcilably conflict with those of other Class members.  Plaintiff is committed to the vigorous prosecution of this action and has retained counsel experienced in litigation of this nature to represent him and the Class.  Plaintiff anticipates no difficulty in the management of this litigation as a Class action.

85.     A class action is the only method for the fair and efficient adjudication of this controversy.  Class members have suffered and will continue to suffer irreparable harm and damages as a result of Defendants' wrongful conduct.  Because of the nature of the individual Class members' claims in this litigation, few, if any, could otherwise afford to seek legal redress against defendants for the wrongs complained of herein, and a representative class action is therefore appropriate, the superior method of proceeding, and essential to the interests of justice. Absent a representative class action, Class members would continue to suffer losses for which they would have no remedy; many Class members would remain ignorant of the significant violations of law  to which they have been exposed and the damages they have suffered or may suffer; the remedial action sought could not be secured or prosecuted.  Even if separate actions could be brought by individual members of the Class, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications which might be dispositive of the interests of the other Class members who are no parties to the adjudications, may substantially impede their ability to

ARONOVITZ & ASSOCIATES, P.A., ATTORNEYS AT LAW, MUSEUM TOWER, SUITE 2700, 150 W. FLAGLER ST., MIAMI, FLORIDA 33130

protect their interests and/or which would establish incompatible standards of conduct for Defendants.

86.     Pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2), Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate injunctive and/or declaratory relief with respect to the Class as a whole.

87.     Notice of pendency of this action can be given either by publication and/or over the Internet.

## FIRST CAUSE OF ACTION - STRICT LIABILITY

88.     Plaintiff incorporates and realleges by reference each and every allegation contained in Paragraphs 1 through 87 above as if set forth verbatim herein.

89.     The chromium, copper and arsenic Treated Wood contains toxic materials manufactured, designed, distributed and sold by Defendants in the design and manufacture of Treated Wood.

90.     The chromium, copper and arsenic chemical preservative used in the design, and manufacture of Treated Wood is and was defective and unreasonably dangerous.

91.     All Defendants failed to warn Plaintiff and the other members of the Class of the presence of aforementioned toxic effects of the materials in Treated Wood.

92.     All Defendants failed to provide the CIS and/or MSDS to Plaintiffs and Class members who were end users and/or purchasers of the Treated Woods Consumer Products.

93.     As a direct and proximate result of the Defendants' failure to warn Plaintiff and other members of the Class of the presence of the defective and unreasonably dangerous and harmful toxic materials in the Treated Wood, Plaintiff and other Class members are at greater risk to sustain and/or in fact, have sustained, severe and permanent injury in the form of the harmful effects of arsenic and/or chromium poisoning. Those members of the Class who are

ARONOVITZ & ASSOCIATES, P.A., ATTORNEYS AT LAW, MUSEUM TOWER, SUITE 2700, 150 W. FLAGLER ST., MIAMI, FLORIDA 33130

children or minors who utilize and/or utilized playground equipment of the adult Class members or municipal property owners maintaining the Treated Wood Consumer Products, including but not limited to playgrounds, playsets and decking on their property, have come into contact with CCA Treated Wood on a constant basis.

94.    Plaintiff and members of the Class have been required to or will be required to undergo medical testing, diagnosis and monitoring ("medical monitoring") to determine if they have any of the deleterious effects of CCA pressure treated wood or whether they have higher than normal levels of arsenic and/or chromium in their systems which therefore might in the future due to the cumulative effects, become deleterious.

95.    By virtue of the foregoing, Plaintiff demands judgment for Plaintiff and the Class which (a) creates a monetary fund to effectuate all of the relief, including remedial relief, sought under Subsections "B" through "F" of the Ad Damnum clause set forth, infra, in this Complaint to which the Court is respectfully referred and (b) affords to Plaintiff and the Class all of the declaratory, remedial and injunctive relief sought under subsection "G" of the Ad Damnum clause set forth, infra, in this Complaint.

96.    In addition, by virtue of the foregoing, Plaintiff and the other members of the Class are entitled to recover the cost of medical monitoring and/or testing as to whether they have any of the effects of arsenic and/or chromium and to monitor for the presence of higher than normal levels of these toxins in their system, award of damages and other appropriate relief.

## SECOND CAUSE OF ACTION - MEDICAL MONITORING

97.    Plaintiff incorporates and realleges by reference each and every allegation contained in Paragraphs 1 through 96 above as if set forth verbatim herein.

98.    Plaintiff, seeks, for the purposes of this claim, asserts and alleges a subclass consisting of those Class members defined in subsections (a) and (c) of the Class definition set

ARONOVITZ & ASSOCIATES, P.A., ATTORNEYS AT LAW, MUSEUM TOWER, SUITE 2700, 150 W. FLAGLER ST., MIAMI, FLORIDA 33130

forth in ¶80 hereinabove ("the "Subclass" hereinafter).

99.    The chromium, copper and arsenic are toxic and hazardous materials contained in the Treated Wood which is manufactured, distributed, sold and marketed by Defendants.

100.    The chromium, copper and arsenic chemical preservative used in the manufacture and design of Treated Wood is and was defective, and in fact, leached into the soil, and unreasonably exposed Plaintiff and members of the Subclass to greater than normal background levels of these toxic chemicals.

101.    Defendants' manufacture, design, distribution, marketing and sale in conjunction with Defendants' failure to warn and misrepresentations concerning the product's hazard has resulted in the exposure by Plaintiff and members of the Subclass to these hazardous and toxic chemicals in the Treated Wood.

102.    As a proximate cause of the exposure, Plaintiff and members of the Subclass have significantly higher increased risks of contracting the various latent diseases stated hereinabove in ¶¶64 through 68.

103.    As a direct and proximate result of the Defendants' acts, including but not limited to Defendants' failure to warn Plaintiff and members of the Class and Subclasses of the presence of the defective and unreasonably dangerous and harmful toxic materials in the Treated Wood, and in designing, manufacturing and selling the Treated Wood, Plaintiff and members of the Class and Subclasses were exposed to the arsenic and/or chromium. Those members of the Class who are children or minors who utilize and/or utilized playground equipment of the adult Subclass members or municipal property owners maintaining playgrounds and playsets on their property, have come into contact with CCA Treated Wood on a constant basis.

104.    Plaintiff and members of the Subclass will be required to undergo medical testing, diagnosis and monitoring ("medical monitoring") to determine if (a) they have higher than

ARONOVITZ & ASSOCIATES, P.A., ATTORNEYS AT LAW, MUSEUM TOWER, SUITE 2700, 150 W. FLAGLER ST., MIAMI, FLORIDA 33130

normal levels of arsenic or chromium, present in their systems which therefore might in the future due to the cumulative effect become deleterious; (ii) hand wipe tests for children to see if their exposure to arsenic is higher than normal exposure levels which, therefore, might in the future, due to the cumulative effect, become deleterious; and (iii) medical monitoring for Subclass members with any symptoms of arsenic and/or chromium poisoning to determine if they have any of the deleterious effects of CCA pressure treated wood or whether they have higher than normal levels of arsenic and/or chromium in their systems.

105.    By virtue of the foregoing, Plaintiff and the other members of the Subclass are entitled to recover the cost of medical monitoring and/or testing as to whether they have any of the effects of arsenic and/or chromium and to monitor for the presence of higher than normal levels of these toxins in their system, award of damages and other appropriate relief.

106.    In addition, by virtue of the foregoing, Plaintiff demands judgment for Plaintiff and the subclass which (a) creates a monetary fund to effectuate all of the relief, including remedial relief, sought under Subsections "B" through "F" of the Ad Damnum clause set forth, infra, in this Complaint to which the Court is respectfully referred and (b) affords to Plaintiff and the subclass all of the declaratory, remedial and injunctive relief sought under subsection "G" of the Ad Damnm clause set forth, infra, in this Complaint.

## THIRD CAUSE OF ACTION - NEGLIGENCE

107.    Plaintiff incorporates and realleges by reference each and every allegation contained in Paragraphs 1 through 106 above as if set forth verbatim herein.

108.    Defendants owed a duty to Plaintiff and other Class members to warn of the potential of reasonably dangerous effects and knew, or should have known, that Plaintiff, other Class members and other end-users of Treated Wood had been injured by wood treated with the aforementioned chromium, copper, arsenic toxins.

109.     Defendants knew, or should have known, that it is and was necessary for Plaintiff and all Class members to receive at the time of sale or delivery, to read and to understand all MSDS and CIS materials for chromium, copper, arsenic Treated Wood.

110.     Defendants knew, or should have known, that Plaintiff and other Class members were at risk of exposure to the toxic effects caused by its use of CCA Treated Wood if they did not have an opportunity to receive, read and understand the MSDS and CIS materials which should have been disseminated to Class members.

111.     Defendants knew, or should have known, that Plaintiff and the other Class members were unlikely to receive, read and/or understand either their MSDS or CIS materials relating to the Treated Wood which contained chromium, copper and arsenic.

112.     Defendants knew, or should have known, that as a result of the Plaintiff's and other Class member's failure to receive, read and/or understand any MSDS and CIS materials, Plaintiff and other Class members would be unaware of the chemical content of the Treated Wood of its harmful effects and would be at risk of being exposed to its toxic effects.

113.     Defendants knew or had reason to know that Plaintiff and other Class members did not know, nor did they have reason to know, that such Treated Wood contained arsenic.

114.     Defendants knew or should have known that Plaintiff and other Class members did not know, nor did they have reason to know, that such Treated Wood contained chromium.

115.     Defendants knew, or had reason to know that Plaintiff and other Class members did not know, nor did they have reason to know, that such Treated Wood contained copper.

116.     Defendants knew or had reason to know that Plaintiff and other Class members did not know, nor did they have reason to know, that such Treated Wood contained Hexavalent Chromium.

117.     Defendants knew or had reason to know that Plaintiff and other Class members

ARONOVITZ & ASSOCIATES, P.A., ATTORNEYS AT LAW, MUSEUM TOWER, SUITE 2700, 150 W. FLAGLER ST., MIAMI, FLORIDA 33130

did not, nor did they have reason to know that such treated Wood contained trivalent arsenic.

118.    Defendants failed to warn Plaintiff and other Class members of the dangers associated with the toxic effects caused by arsenic, trivalent arsenic, chromium, copper, and hexavalent chromium.

119.    Defendants failed to warn Plaintiff and other Class members that the chemical preservative in Treated Wood was a carcinogen.

120.    Defendants failed to warn that the chemical preservative in Treated Wood would leach from Treated Wood into soil and plants.

121.    As a direct and proximate result of defendants' failure to effectively warn of the dangers associated with its Treated wood, Plaintiff and other Class members have been damaged.

122.    By virtue of the foregoing, Plaintiff and other members of the Class are entitled to an award of damages and other appropriate relief.

123.    In addition, by virtue of the foregoing, Plaintiff demands judgment for Plaintiff and the Class which (a) creates a monetary fund to effectuate all of the relief, including remedial relief, sought under Subsections "B" through "F" of the Ad Damnum clause set forth, _infra_, in this Complaint to which the Court is respectfully referred and (b) affords to Plaintiff and the Class all of the declaratory, remedial and injunctive relief sought under subsection "G" of the Ad Damnum clause set forth, _infra_, in this Complaint.

## FOURTH CAUSE OF ACTION - FRAUD

124.    Plaintiff and Class members incorporate and reallege by reference each and every allegation contained in paragraphs 1 through 123 above as if set forth herein verbatim.

125.    As alleged above, Defendants voluntarily and publicly disseminated advertisements, literature and other statements concerning the favorable chemical components and features of Treated Wood, including its safety.

31

126.   Defendants' failure to disclose that Treated Wood was toxic, dangerous or that it contained poisons was misleading or was likely to mislead.

127.   Defendant's knew or had reason to know the true facts concerning the potentially dangerous effects of Treated Wood, as detailed above, and either knowingly or recklessly disregarded the potential ramifications of disclosing the facts of those potential dangers to Plaintiff and Class members, but failed and/or refused to do so, fraudulently concealing the true facts.

128.   Defendants' willful non-disclosures or concealments were made with the intent to deceive Plaintiff and other Class members and, in fact, did so, as evidenced by their purchase and use of Treated Wood.

129.   Plaintiff and the Class were subjected to the barrage of false and/or misleading and/or half-truths disseminated in writing by Defendants as detailed hereinabove in ¶¶'s 55 through 60 above.

130.   Plaintiff and other Class members, unaware of the fact that Defendants' written statements, previously set forth in ¶¶'s 55 through 60 above were misleading, and the fact that Defendants' non-disclosures and concealments or suppression of said material facts, purchased, installed, maintained or used Treated Wood reasonably relying on the express written misrepresentations and/or the omissions and concealments of Defendants and/or their agents, employees, representatives and/or servants.  Plaintiff and other members of the Class could not have discovered in the exercise of reasonable diligence Defendants' fraud and misrepresentations.  Had Plaintiff and other members of the Class known of the true, non-disclosed, concealed or otherwise suppressed facts, they would not have purchased, installed, maintained or used Treated Wood.

131.   As a proximate result of the foregoing misrepresentations and/or omissions,

32

Plaintiff and other members of the Class have suffered damages.  By virtue of the foregoing, Plaintiff and other members of the Class are entitled to an award of damages and other appropriate relief.

132.    In addition, by virtue of the foregoing, Plaintiff demands judgment for Plaintiff and the Class which (a) creates a monetary fund to effectuate all of the relief, including remedial relief, sought under Subsections "B" through "F" of the Ad Damnum clause set forth, infra, in this Complaint to which the Court is respectfully referred and (b) affords to Plaintiff and the Class all of the declaratory, remedial and injunctive relief sought under subsection "G" of the Ad Damnum clause set forth, infra, in this Complaint.

## FIFTH CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY

133.    Plaintiff and Class members incorporate and reallege by reference each allegation contained in paragraphs 1 through 133 above as if set forth herein verbatim.

134.    Defendants impliedly represented and warranted that Treated Wood being sold to the general public, including Plaintiff and Class members, was free of defects, merchantable, and fit for the intended purpose.

134.    Defendants breached the aforementioned representations and implied warranties, allowing such representations to be made with the intent of inducing Plaintiff and other Class members to purchase the Treated Wood products enumerated herein.

136.    If Plaintiff and members of the Class had known the true facts concerning the chemical components of Treated Wood, they would not have purchased, installed, maintained or used the enumerated products with Treated Wood.

137.    The element of privity, if found to be applicable, exists vis-à-vis Defendants and members of the Class because, inter alia, (i) Defendants have had direct communications with members of the Class through magazine articles, public releases and advertisements, (ii) the

ARONOVITZ & ASSOCIATES, P.A., ATTORNEYS AT LAW, MUSEUM TOWER, SUITE 2700, 150 W. FLAGLER ST., MIAMI, FLORIDA 33130

Retail Defendants that have sold Treated Wood to Class members or otherwise communicated with Class members are agents, in law or in fact, of all Defendants and (iii) Plaintiff and members of the Class are third-party beneficiaries of warranties that ran from all Defendants to their agents and retail outlets; (iv) Defendants expressly took on the duty and responsibility in connection with the RPAR proceeding to disseminate accurate disclosures to Plaintiff and members of the Class at the time of delivery and/or sale; (v) the use of the Treated Wood products involve potential physical or personal injury and irreparable harm to the environment.

138. In any event, the acts of Defendants thereafter to cause and/or have caused personal injury in a manner requiring that no privity be required.

139. In addition, by virtue of the foregoing, Plaintiff demands judgment for Plaintiff and the Class which (a) creates a monetary fund to effectuate all of the relief, including remedial relief, sought under Subsections "B" through "F" of the Ad Damnum clause set forth, infra, in this Complaint to which the Court is respectfully referred and (b) affords to Plaintiff and the Class all of the declaratory, remedial and injunctive relief sought under subsection "G" of the Ad Damnum clause set forth, infra, in this Complaint.

### SIXTH CAUSE OF ACTION - VIOLATION OF §104(a) OF THE MAGNUSON-MOSS CONSUMER PRODUCTS WARRANTIES ACT, 15 U.S.C. 2301, ET SEQ.

140. Plaintiff and Class members incorporate and reallege by reference each allegation contained in paragraphs 1 through 139 above as if set forth herein verbatim.

141. The Magnuson-Moss Consumer Products Liability Act, 15 U.S.C §2301, et seq. ("MMCPWA") provides a private right of action by purchasers of consumer products against manufacturers and retailers who, inter alia, fail to comply with the terms of a written warranty, express warranty and/or implied warranty. As demonstrated above, Defendants have failed to comply with the terms of their warranties, written, express and implied, with regard to the

ARONOVITZ & ASSOCIATES, P.A., ATTORNEYS AT LAW, MUSEUM TOWER, SUITE 2700, 150 W. FLAGLER ST., MIAMI, FLORIDA 33130

Treated Wood Consumer Products that they designed, manufactured, distributed, marketed and/or sold.

142.    Plaintiff and the members of the Class are "consumers" under the MMCPWA.

143.    Defendants have been given a reasonable opportunity by Plaintiff and other Class members to cure such failures to comply, and has repeatedly failed to do so.

144.    By virtue of the foregoing, Plaintiff and other members of the Class are entitled to an award of damages and other appropriate relief.

145.    In addition, by virtue of the foregoing, Plaintiff demands judgment for Plaintiff and the Class which (a) creates a monetary fund to effectuate all of the relief, including remedial relief, sought under Subsections "B" through "F" of the Ad Damnum clause set forth, infra, in this Complaint to which the Court is respectfully referred and (b) affords to Plaintiff and the Class all of the declaratory, remedial and injunctive relief sought under subsection "G" of the Ad Damnum clause set forth, infra, in this Complaint.

### SEVENTH CAUSE OF ACTION -
### STATE CONSUMER PROTECTION LAWS

146.    Plaintiff herein asserts a subclass consisting of those Class members defined in subsections (a) and (c) of the Class definition set forth in ¶80 hereinabove (the "Subclass").

147.    Plaintiff and the Subclass members were and are consumers under the Florida Consumer Protection Statutes, including but not limited to F.S. Sec. 501.204 making unlawful "unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." All other states have similar consumer fraud statutes making such acts and practices unlawful.

148.    The selling of Treated Wood to consumers, such as Plaintiff and the Subclass while falsely touting its safety and/or concealing or omitting to reveal the actual and potential effects of the Treated Wood as aforestated herein constitutes false and misleading business

ARONOVITZ & ASSOCIATES, P.A., ATTORNEYS AT LAW, MUSEUM TOWER, SUITE 2700, 150 W. FLAGLER ST., MIAMI, FLORIDA 33130

practices, unconscionable acts or practices and/or unfair or deceptive acts or practices.

149. As a result thereof, Plaintiff and members of the Subclass have been injured in that they are required to expend sums to seal, coat, remove or safely dispose of the Treated Woods products purchased. In addition, they are entitled to rescission and appropriate refunds.

150. Furthermore, as a result thereof, Plaintiff and the Subclass is entitled to all of the relief, including monetary, equitable, injunctive, declaratory and remedial relief, set forth in the Ad Damnum clause, *infra*, in this Complaint.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all other similarly situated, prays for judgment and relief against the Defendants as follows:

A) Declaring this action to be a proper class action maintainable under Federal Rules of Civil Procedure, Rule 23, and certifying an appropriate Class and/or Subclass and certifying Plaintiff as Class and Subclass representative;

B) (1) Providing a fund for the purposes of dissemination of the information required hereunder; and paying for the monitoring of a corrective campaign.

(2) Creating a monetary fund for remediation, including but not limited to the costs of proper and environmentally safe disposal or removal of the enumerated Treated Wood products, the costs of sealing and/or coating all contaminated wood surfaces at least every two (2) years;

C) Actual damages in an amount to be determined at trial;

D) Requiring Defendants to pay for medical monitoring and testing;

E) Ordering Defendants to pay for the independent testing of soil on all sites where Treated Wood Consumer Products used by children have been installed and

ARONOVITZ & ASSOCIATES, P.A., ATTORNEYS AT LAW, MUSEUM TOWER, SUITE 2700, 150 W. FLAGLER ST., MIAMI, FLORIDA 33130

remove any such contaminated soil and Treated Wood and/or pay for all costs and fees associated with such soil remediation;

F) A temporary, preliminary or permanent order for the purposes of:

(1) enjoining the Defendants from conducting business using the unlawful acts and practices described in this Complaint;

(2) enjoining Defendants from engaging in false and misleading advertising regarding Treated Wood;

(3) ordering Defendants to conduct a corrective information campaign advising consumers and end-users of treated Wood as to the chemical components of Treated Wood ;

(4) ordering Defendants to stamp, brand or otherwise provide an indication on Treated Wood of the chemical component of the preservative in Treated Wood and the dangers associated therewith;

(5) ordering Defendants to stamp, brand or other wise indicate on Treated Wood the necessity of reading the Material Safety Data Sheet and Consumer Information Sheets associated therewith;

(6) ordering Defendants and prepare and distributing to known and future purchasers of Treated Wood a video describing in sufficient detail the potential dangerous and damaging effects of Treated Wood.

G. The costs and disbursements incurred by Plaintiffs in connection with this action, including reasonable attorneys' fees; and,

H. Such other and further relief as the Court deems just and proper.

ARONOVITZ & ASSOCIATES, P.A., ATTORNEYS AT LAW, MUSEUM TOWER, SUITE 2700, 150 W. FLAGLER ST., MIAMI, FLORIDA 33130

DATED at Miami-Dade County, Florida this __8__ day of March, 2001.

Respectfully Submitted,

**ARONOVITZ & ASSOCIATES, P.A.**
Tod Aronovitz, Esq.
Florida Bar No. 186430
150 West Flagler Street
Suite 2700 – Museum Tower
Miami, Florida 33130
305-372-2772
305-375-0243 (facsimile)
ta@aronovitzlaw.com

**KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**
Gary S. Graifman, Esq.
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
(845) 356-2570

**McCREA & McCREA**
David McCrea, Esq.
119 South Walnut Street
P.O. Box 1310
Bloomington, Indiana 47402-1310

**BUCKLAND & SCHUMM**
Jerry Schumm, Esq.
120 Prospect Street
Bellingham, Washington 98225

**Attorneys for Plaintiff**

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS

**JERRY JACOBS, individually and on behalf of all others similarly situated,**

## DEFENDANTS

**OSMOSE, INC., HICKSON CORPORATION, USA, HICKSON CORP., HICKSON INTERNATIONAL, PLC, ARCH CHEMICALS, INC., HOME DEPOT, USA., INC.ET AL.,**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   **Miami-Dade**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
**TOD ARONOVITZ, ESQ. (FBN 186430)**
**ARONOVITZ & ASSOCIATES,**
**150 W. Flagler Street, Suite 2700**
**Miami, FL 33130   (305-372-2772)**

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:   **DADE**   MONROE,   BROWARD,   PALM BEACH,   MARTIN,   ST. LUCIE,   INDIAN RIVER,   OKEECHOBEE   HIGHLANDS

## II. BASIS OF JURISDICTION   (PLACE AN  X  IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                                    AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ B☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | **PERSONAL INJURY** ☐ 362 Personal Injury Med. Malpractice | | | ☐ B☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | ☐ B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☒ 365 Personal Injury Product Liability | ☐ B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 330 Federal Employers Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 340 Marine | | ☐ B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| ☐ B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** ☐ 370 Other Fraud | ☐ B☐ 690 Other | | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | | **B SOCIAL SECURITY** | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **A LABOR** | ☐ 861 HIA (1395ff) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 893 Environmental Matters |
| | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 894 Energy Allocation Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ B☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ B☐ 530 General | | ☐ A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☒ 890 Other Statutory Actions |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ B☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | | A OR B |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ B☐ 540 Mandamus & Other | ☐ A☐ 791 Empl. Ret. Inc. Security Act | ☐ A☐ 871 IRS — Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | | ☐ B☐ 550 Civil Rights | | | |
| | | ☐ B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

**15 U.S.C. Section 2301 (Magnuson - Moss Consumer Products Warranties Act)**

LENGTH OF TRIAL
via ___ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☒ UNDER F.R.C.P. 23

DEMAND $ ~~MORE THAN~~ **$75,000**

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒☒ YES   ☐ NO

## VIII. RELATED CASE(S) IF ANY   (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE   **3/8/01**

SIGNATURE OF ATTORNEY OF RECORD   *[signature]*

$150.00   838021

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE   **03/08/01**